United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHERRY LYNN MEANS,

          Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, DEPARTMENT OF PUBLIC HEALTH; and DOES 1 through 25,

          Defendant.

NO. C09-0941 TEH

<u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

This matter came before the Court on August 9, 2010, on the motion for summary judgment filed by Defendant City and County of San Francisco, Department of Public Health ("City"). For the reasons set forth below, the City's motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

In April 2002, Plaintiff Sherry Lynn Means ("Means") began working as a certified nursing assistant at Laguna Honda Hospital and Rehabilitation Center ("Laguna Honda" or "Hospital"), a licensed acute-care hospital and skilled nursing facility operated by the City. She was terminated on September 17, 2008, after a period of unpaid administrative leave following allegations that Means used vulgar language with patients, initiated an unauthorized investigation of sexual assault at the Hospital, lied to supervisors investigating the incident, attempted to break in to her supervisor's office, and threatened coworkers with violence. Means challenges these allegations, and in a Complaint filed March 4, 2009, Means claims that she was unlawfully discriminated against, retaliated against, and harassed in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as well as California's Fair

Employment and Housing Act ("FEHA"). Means also alleges that the City discriminated against her in the making and enforcement of contracts under 42 U.S.C. section 1981 ("section 1981"), and that the City's actions disqualified her from her profession on the basis of race in violation of Article I, section 8, of the California Constitution. The City moved for summary judgment on August 9, 2010; Means opposed the motion.

In October 2001, nearly seven years before the City terminated Means, Means applied for a certified nursing assistant position at Laguna Honda. When the City did not hire Means, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming that Laguna Honda denied her employment because of her race. The EEOC issued a right-to-sue notice, but instead of filing a lawsuit, Means entered into a settlement agreement with the City in March 2002. As a result of the settlement agreement, the City offered Means a position as a certified nursing assistant at Laguna Honda, and Means released the City from all "past, present or future" claims relating to Means's denial of employment with the City. Bond Decl., Ex. H, at 3.

Means began working at Laguna Honda in April 2002. She alleges that during her employment she was "subjected to a continuing pattern of unlawful discriminatory employment practices." Means Decl. ¶ 5. For example, Means alleges that she was continuously referred to as "black and ugly" in Tagalog by supervisors and coworkers. *Id.*; Means Depo. 60:5. The Tagalog phrase was "pangit itim nasyr," and Means recounted hearing it from an employee named "Noda" and Charge Nurse Fely Dilag ("Dilag"). Means Depo. 60:16-19; Ramirez Decl., Ex. B. Yet they were not the only ones who used the phrase. Hearing "that phrase so much from men and women on just about every ward [she] went" prompted Means to take Tagalog classes. Means Depo. 59:13-15; 60:7-10.

Means also alleges that she was (1) given "the most difficult, undesirable[,] and onerous" assignments while non-black coworkers got easier assignments; (2) criticized without justification while non-black employees, whose work was unsatisfactory, were not criticized; (3) "addressed in an insulting manner" by supervisors and non-black coworkers, while non-black employees were treated with respect; (4) "humiliated and ridiculed" by

supervisors and non-black coworkers; (5) subjected to scrutiny without justification while non-black employees whose work was unsatisfactory were not scrutinized; and (6) harassed by supervisors and non-black coworkers. Means Decl. ¶ 5.

The events that led to Means's termination began on or around May 23, 2008, when Means learned that the Hospital was conducting an investigation into allegations that a resident in Unit G3 had been sexually assaulted. The patients in Unit G3 are women with serious psychological problems, including paranoia and schizophrenia. After learning about the sexual assault investigation, Means asked at least one patient in Unit G3 whether she had been sexually assaulted.[1] Two residents became frightened and upset as a result of Means's comments, and they complained to Dilag, the nurse in charge of Unit G3. Dilag informed Nursing Supervisor Monica Maguire of the complaints, and Maguire met with Means and her union representative the same day. At that meeting, Means denied speaking to patients about sexual assault. She had visited Unit G3 to get cups, she said. This was not true, but Means was trying to protect Registered Nurse Cristina Santo Domingo ("Santo Domingo"), who Means said told her to go to Unit G3 and find out about the sexual assault allegations. Santo Domingo also told Means to lie about why she was in Unit G3, according to Means. Santo Domingo is one of Means's superiors, but Means admits that Santo Domingo did not send her to Unit G3 on an assignment, but to "get the gossip." Means Depo. 112:21-25.

Maguire told Teresita Baluyut ("Baluyut"), Means's supervisor, about the incident, and Baluyut conducted an investigation. Baluyut and Senior Personnel Analyst Willie Ramirez ("Ramirez") met with Means and her union representative on May 29, 2008. Means again said that she had gone to Unit G3 to get cups. At this meeting, Means submitted a letter denying that she had made any "inappropriate" comments to residents, and claimed that Dilag, who had reported the incident, said otherwise because she was homophobic and "intolerant of Afro-Americans." Ramirez Decl. ¶ 7 & Ex. B.

---

[1] According to Means, she asked one patient, "[H]as anybody been playing between your legs in a way that's not right?" Means Depo. 112:6-9. The City contends that Means spoke with at least two residents using "graphic and offensive" language. Baluyut Decl. ¶¶ 5-7.

3

Means's supervisors proposed a five-day suspension for Means, and they held a meeting on July 7, 2008, to give Means an opportunity to respond. At this meeting, Means accused Baluyut of being racist and attributed her suspension to the fact that she was African American. In a declaration, Means further contends that Baluyut has a reputation "reflecting racist attitudes and conduct against African American employees." Means Decl. ¶ 36. After the meeting regarding Means's suspension, Baluyut and her supervisor, Laguna Honda's Nursing Director Mercedes Devasconcellos ("Devasconcellos"), agreed to suspend Means for five days. On July 16, 2008, Means met with Devasconcellos and accepted the five-day suspension, which they decided she would serve on July 23 through July 27.

Baluyut discovered that someone had attempted to break into her office on Monday, July 21, 2008. Baluyut met with Devasconcellos and Ramirez about the incident, and through an investigation they learned that Santo Domingo had observed Means tampering with Baluyut's door on Friday, July 18, 2008. Santo Domingo also said that she heard Means call Baluyut a "devil" and a "demon," and that Means said she was going to "piss on [Baluyut's] face" and "let blood drip on [Baluyut]." Means denies damaging the door to Baluyut's office. However, she admits that on other occasions she joined discussions with colleagues, including Santo Domingo, in which they spoke "in a disparaging fashion" about Baluyut's actions and behavior. Means Decl. ¶ 65. Means admits calling Baluyut a "devil" and a "demon," but says these comments were no different from those made by her coworkers. *Id.* at ¶ 97; Means Depo. 229:14-15.

Santo Domingo also told Devasconcellos, Ramirez, and Baluyut that Means had offered to put a contract out on Santo Domingo's husband for $20,000. Means admits this, but contends that she was kidding. Means Decl. ¶ 68. Santo Domingo said Means had repeatedly asked her where Baluyut parked her car, and that Means said she was friends with a former patient who was a member of the BB Notorious Gang, all of which Means denies. Finally, Santo Domingo told Devasconcellos, Ramirez, and Baluyut that Means had said that if she were fired, she would bring a gun to work and shoot people. In her declaration, Means

4

denies saying this, but in her deposition, she admits it and says she was joking. Means Decl. ¶ 20; Means Depo. 106:23-25, 107:1-5.

Ramirez initiated an investigation of the damage to Baluyut's door and allegations that Means had threatened violence. He spoke with Means's coworkers, who claimed that Means had threatened Baluyut. They also said they had heard Means say she would bring a gun to work if she were fired. On July 29, 2008, Ramirez sent Means a letter telling her of the allegations that she had damaged City property, and asking that she participate in an investigatory interview on July 31, 2008. At the interview, Means denied tampering with Baluyut's door, but admitted saying that she would come to work with a gun if she were fired. After the meeting, Ramirez put Means on unpaid administrative leave. On August 29, 2008, the City notified Means of its intention to dismiss her and scheduled a meeting to give Means an opportunity to respond. Means attended with her union representative and her attorney, who participated in the meeting. On September 17, 2008, the City notified Means that it had terminated her.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The Court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.  The Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

5

*Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponents will have the burden of proof at trial, the moving party can prevail merely by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256.

**DISCUSSION**

The City asks the Court to grant summary judgment on all eight claims in Means's Complaint: (1) race discrimination under Title VII, (2) retaliation under Title VII, (3) harassment under Title VII, (4) race discrimination in the making and enforcement of contracts under section 1981, (5) race discrimination under FEHA, (6) retaliation under FEHA, (7) harassment under FEHA, and (8) disqualification from a profession on the basis of race under Article 1, section 8, of the California Constitution.

**I. Title VII, Section 1981, and FEHA Race Discrimination Claims**

Means brings her first, fourth, and fifth causes of action under Title VII, section 1981, and FEHA, respectively, all of which proscribe disparate treatment on the basis of race. 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981; Cal. Gov't Code § 12940(a). The parties agree that these discrimination claims are analyzed under the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1103, 1105 (9th Cir. 2008) (applying *McDonnell Douglas* to Title VII and section 1981 claims); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000) (applying *McDonnell Douglas* to FEHA claims). Under *McDonnell Douglas*, Means must prove a *prima facie* case of discrimination by showing (1) she is a member of a protected class, (2) she was performing the position she held competently, (3)

6

1 she suffered an adverse employment action, and (4) "circumstances ... give rise to an
2 inference of unlawful discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,
3 253 (1981); *Guz*, 24 Cal. 4th at 355. If Means succeeds, the burden of production shifts to the
4 employer to present legitimate reasons for the adverse employment action. *Burdine*, 450 U.S.
5 at 254. An employer's reasons need not rest upon true information. *Villiarimo v. Aloha
6 Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). Instead, courts "only require that an
7 employer honestly believed its reasons for its actions, even if its reason is foolish or trivial or
8 even baseless." *Id.* (quotations omitted). "If the employer carries this burden, and plaintiff
9 demonstrates a genuine issue of material fact as to whether the reason advanced by the
10 employer was a pretext, then the retaliation case proceeds beyond the summary judgment
11 stage." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004); *Reeves
12 v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). Evidence of a *prima facie*
13 case of discrimination can raise an inference of pretext. *Reeves*, 530 U.S. at 143.

14 Means contends that her five-day suspension, unpaid administrative leave, and
15 termination were adverse employment actions taken on account of her race. Means also
16 claims that (1) her supervisors and coworkers called her "black and ugly;" (2) she was given
17 more difficult assignments than her non-black coworkers; (3) she was unjustly criticized for
18 her performance while non-black coworkers whose work was less satisfactory were not
19 criticized; (4) her work was scrutinized more closely than non-black coworkers whose work
20 was less satisfactory; (5) supervisors and coworkers addressed her in an insulting manner,
21 while non-black colleagues were treated with respect; (6) supervisors and coworkers
22 humiliated and ridiculed her; and (7) her supervisors and non-black coworkers harassed her.
23 Means has abandoned any claim of race discrimination arising out of the City's initial refusal
24 to hire Means in 2001. Means Opp'n 19:16-20.

25 With regard to Means allegations that she was criticized and scrutinized more than
26 non-black employees, and that she was given more onerous assignments than non-black
27 colleagues, Means fails to make a *prima facie* case of race discrimination. *See Burdine*, 450
28

7

1 U.S. at 253; *Guz*, 24 Cal. 4th at 355. She presents no evidence of the circumstances of these
2 events, and thus the Court cannot infer that they relate to Means's race.

3       The Court assumes without deciding that Means's allegations make a *prima facie* case
4 of race discrimination with regard to her five-day suspension, administrative leave, and
5 termination. *See Burdine*, 450 U.S. at 253; *Guz*, 24 Cal. 4th at 355. The burden of production
6 then falls upon the City to articulate legitimate, non-discriminatory reasons for taking these
7 actions. *See Burdine*, 450 U.S. at 254. According to the City, it suspended Means for five
8 days because she made sexual comments to residents[2] and lied to supervisors investigating
9 the incident. The City put Means on unpaid administrative leave and eventually terminated
10 her after her supervisors were told that Means had tampered with Baluyut's office door, and
11 that Means called Baluyut a "devil" and a "demon," and said she was going to "piss on
12 [Baluyut's] face" and let her "blood drip on [Baluyut]."[3] Furthermore, Means's supervisors
13 learned that Means had repeatedly asked a co-worker where Baluyut parked her car, and
14 stated that she was friends with a former patient of Laguna Honda who was a member of the
15 BB Notorious Gang. Employees also reported that Means had made threats in the past–she

---

[2] Means seeks to exclude a portion of Baluyut's declaration in which Baluyut says that "Ms. Means made a series of inappropriate sexual comments to patients in Unit G3 at Laguna Honda" and that residents "said Ms. Means used 'disgusting' words." Means argues that Baluyut's statements are inadmissible hearsay and inadmissible opinion evidence, and that Baluyut lacks personal knowledge. However, this evidence is not being offered for its truth, but rather its impact upon Baluyut, the decision maker, and is therefore not hearsay. *See Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1456 (9th Cir. 1983) (allowing testimony by employer regarding third parties' complaints about working with plaintiff). Furthermore, Baluyut's testimony is based upon her personal knowledge of third parties' complaints, and it is not improper opinion testimony because it is based on Baluyut's investigation, it is helpful to the determination of the City's reasons for disciplining Means, and it does not involve technical, scientific, or specialized knowledge.

[3] Means seeks to exclude portions of the declarations of Baluyut, Ramirez, and Devasconcellos in which they recount being told of these events, arguing that various portions are inadmissible hearsay, inadmissible opinion, irrelevant, and lack personal knowledge. While this evidence would be hearsay if it were offered for its truth, it is being offered to show that Baluyut, Ramirez, and Devasconcellos received complaints about Means. *See Haddad*, 720 F.2d at 1456. Therefore, it is not hearsay. Furthermore, it is not improper opinion evidence, it is highly relevant, and Baluyut, Ramirez, and Devasconcellos have personal knowledge of what they were told. Means raises dozens of similar objections with regard to the fruits of Baluyut, Ramirez, and Devasconcellos's investigations. They are meritless.

8

had offered to put a contract out on Santo Domingo's husband, and had said that if she were fired she would bring a gun to work and shoot people.

Means argues that these are not legitimate reasons for the City's actions because they are based on allegations she contends are untrue and unworthy of belief. However, whether the underlying allegations are untrue or hard to believe is irrelevant. *See Villiarimo*, 281 F.3d at 1063. The question is whether Means's supervisors honestly believed them in deciding whether to take disciplinary action against Means. *See id.* Means offers no evidence to suggest that Means's supervisors were doing anything other than honestly responding to events at Laguna Honda. She does not allege that her supervisors' accounts of what people told them about Means's conduct are untruthful. Instead, she attacks the credibility of what her supervisors were told, which does not demonstrate pretext. The Court takes Means's failure to point to any evidence of pretext to be a concession that the city's justifications were not pretextual.

Furthermore, Means's *prima facie* case of discrimination does not raise an inference of pretext. *See Reeves*, 530 U.S. at 143. Means alleges that she was continuously called "black and ugly" by her supervisors and non-black coworkers, but she does not allege that anyone with a say in the decision to discipline her called her "black and ugly" or made other offensive comments with regard to her race.[4] Means did accuse Baluyut of being racist at the July 7, 2008, meeting to discuss Means's proposed five-day suspension, and she alleges that Baluyut has a reputation for being racist against African Americans. However, even if these allegations are true, they do not support an inference that Baluyut, much less all managers involved in Means's discipline, manufactured the reasons for disciplining Means. As noted above, Means admits some of the conduct leading to her termination. She admits asking a patient if she had been sexually assaulted and lying about it, which is the conduct that led Baluyut to recommend Means's suspension. Means admits making jokes about bringing a

---

[4] One of the people that Means says called her "black and ugly" is Dilag, the nurse in charge of Unit G3, where the alleged sexual assault occurred. However, Dilag merely reported Means's statements to her superiors, and had no input into the decision to discipline Means.

9

gun to work and shooting people if she were fired, which contributed to her period of unpaid leave and termination. While Means denies tampering with Baluyut's door, Means offers no evidence to suggest that her supervisors had anything other than an honest belief that she was responsible. Even if Baluyut's motivations are rendered suspect by Means's allegations, the supervisor in charge of the discipline Means received as a result of the door incident was Ramirez, about whose intentions Means offers no evidence. Therefore, Means has not shown that any of the people involved in her discipline harbored discriminatory motives such that a reasonable jury could find that their stated reasons for taking action against Means were pretextual.

Means's *prima facie* case also includes the allegations that she was harassed, insulted, given undesirable ward assignments, criticized, scrutinized, and humiliated in a way that her non-black colleagues were not. However, these allegations contain no reference to specific events or people such that they could be weighed against the City's legitimate reasons for taking adverse action against Means. They do not raise a genuine issue of material fact, and summary judgment is therefore GRANTED as to Means's Title VII, section 1981, and FEHA claims of race discrimination.

**II. Title VII and FEHA Retaliation Claims**

The parties agree that the *McDonnell Douglas* framework also applies to claims of retaliation under Title VII and FEHA. *Surrell*, 518 F.3d at 1107-08; *Addy v. Bliss & Glennon*, 44 Cal. App. 4th 205, 217 (1996). Here, a *prima facie* case is made by showing that (1) Means engaged in a protected activity; (2) she was thereafter subjected to an adverse employment action; and (3) that there exists a causal link between the protected activity and the adverse employment action. *Surrell*, 518 F.3d at 1108*; Guthrey v. State of California*, 63 Cal. App. 4th 1108, 1125 (1998).

For the reason stated above, Means fails to make a *prima facie* case of retaliation with regard to her allegations of criticism, scrutiny, and onerous assignments. The Court assumes without deciding that Means makes a *prima facie* case of retaliation with regard to her

1  suspension, administrative leave, and termination. However, as above, Means does not
2  provide any evidence that the City's reasons for disciplining Means are mere pretext. *See*
3  *Coons*, 383 F.3d at 887. Furthermore, for the reasons stated above, Means's *prima facie* case
4  does not raise an inference of pretext. *See Reeves*, 530 U.S. at 143. The Court again takes
5  Means's failure to point to specific evidence in the record showing pretext to be a concession
6  that none exists. Therefore, summary judgment is GRANTED as to Means's Title VII and
7  FEHA claims of retaliation.

**III. Title VII and FEHA Harassment Claims**

To prevail on a racial harassment claim under Title VII and FEHA, Means must show: (1) that she was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of Means's employment and create an abusive work environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal. 4th 121, 130 (1999) (using Title VII law to interpret FEHA). Unless extremely serious, "[s]imple teasing, offhand comments, and isolated incidents" do not alter the conditions of employment. *Manatt v. Bank of America, NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quotations omitted).

In *Manatt*, the Ninth Circuit found that plaintiff's conditions of employment were not altered where coworkers ridiculed plaintiff's pronunciation and pulled their eyes back with their fingers in an attempt to mock the appearance of Asians. 339 F.3d at 798. These events took place on two occasions, and as isolated incidents they did not amount to actionable discrimination, the court held. *Id.* However, in *El-Hakem v. BJY Inc.*, the Ninth Circuit held that conduct toward an Arab employee, which in isolation might not rise to the level of discrimination, over time could lead a reasonable jury to conclude that the conduct was sufficiently pervasive to alter the conditions of plaintiff's employment. 415 F.3d 1068, 1073 (9th Cir. 2005). Plaintiff's boss refused to use plaintiff's real name, instead developing

11

1  nicknames such as "Manny" for "Mamdouh," and "Hank" for "Hakem." *Id.* at 1073-74.
2  Plaintiff's boss used these names on a regular basis for almost a year. *Id.*

3  Means contends that she was continuously called "black and ugly" in Tagalog during
4  her employment as a certified nursing assistant at Laguna Honda. This is verbal conduct of a
5  racial nature, and it is uncontested that if the comments were made, they were unwelcome.
6  The question is whether the conduct was sufficiently severe or pervasive to alter the
7  conditions of Means's employment. *See Vasquez*, 349 F.3d at 642; *Aguilar*, 21 Cal. 4th at
8  130. The City argues that Means "could only identify" two employees who referred to Means
9  as "black and ugly." City Mot. Summ. J. 20:4. However, while Means recounted incidents of
10 being referred to in this way by an employee named "Noda" and Charge Nurse Dilag, they
11 were not isolated. Means said she "heard that phrase so much from men and women on just
12 about every ward [she] went." Means Depo. 59:13-15.

13 While being called "black and ugly" is comparable to the non-discriminatory racial
14 comments in *Manatt*, unlike in *Manatt*, where only two instances of unwelcome racial
15 conduct toward plaintiff were at issue, Means contends that the phrase, "black and ugly," was
16 directed at her continuously throughout her employment at Laguna Honda. *See* 339 F.3d at
17 798. Given that Means worked at Laguna Honda for more than six years, the racial conduct
18 towards her was more pervasive than the conduct in *El-Hakem*, which lasted less than one
19 year. *See* 415 F.3d at 1073-74. As in *El-Hakem*, a reasonable jury could conclude that Means
20 was subjected to harassment so pervasive as to alter the conditions of her employment.

21 Means also alleges that she was given the most onerous work assignments, insulted,
22 humiliated, and harassed because of her race. She says she was criticized and scrutinized
23 more than her non-black colleagues. However, Means presents no evidence explaining these
24 events, nor does she provide evidence giving rise to an inference that the events had to do
25 with her race. Therefore, while Means's harassment claim survives, it is limited to Means's
26 claim that she was continuously called "black and ugly." Therefore, summary judgment as to
27 Means's Title VII and FEHA harassment claims is DENIED.

28

## IV. Constitutional Claim

The City argues that because Means has not met her burden with respect to her Title VII, section 1981, and FEHA race discrimination claims, the Court should grant summary judgment with respect to her claim under Article I, section 8, of the California Constitution, which provides that "[a] person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin." Means responds by arguing that she has presented substantial evidence of race discrimination. Because Means has not met her burden under her Title VII, section 1981, and FEHA race discrimination claims, her claim under the California Constitution also fails, and summary judgment is GRANTED.

## CONCLUSION

The City's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted to the City as to the first cause of action for violation of Title VII's race discrimination provisions, second cause of action for violation of Title VII's retaliation provisions, fourth cause of action for discrimination under section 1981, fifth cause of action for violation of FEHA's race discrimination provisions, sixth cause of action for violation of FEHA's retaliation provisions, and eighth cause of action for violation of Article I, section 8, of the California Constitution. Summary judgment is denied, however, as to Means's third and seventh causes of action, for harassment in violation of Title VII and FEHA.

**IT IS SO ORDERED.**

Dated: 9/17/10

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT